# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNIVERSAL INSTRUMENTS CORPORATION, a Delaware Corporation,<br><br>Plaintiff,<br>v.<br><br>MICRO SYSTEM ENGINEERING, INC., an Oregon Corporation and MISSOURI TOOLING & AUTOMATION, a Missouri Corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CASE NO.**  3:13-CV-831 (FJS/CFH)

## COMPLAINT

The Plaintiff, Universal Instruments Corporation ("Plaintiff Universal" or "Universal") for its complaint against the Defendant, Micro System Engineering, Inc. ("MSEI") and the Defendant Missouri Tooling & Automation ("Defendant Missouri" or "Missouri") states as follow:

### INTRODUCTION

1.      This action is based upon breach of contract, trade secret misappropriation, unfair competition, unjust enrichment, and promissory estoppel.

### THE PARTIES

2.      The Plaintiff is a Delaware corporation having its principal place of business at 33 Broome Corporate Parkway, Conklin, NY 13748.

3.      The Plaintiff designs and manufactures advanced automation and

1

assembly equipment solutions for the electronic manufacturing industry.

4.     The Plaintiff provides complete assembly lines to electronics manufacturing service providers, original design manufacturing companies, and electronic assemblers.

5.     The Plaintiff owns U.S. Federal Trademark Registration No. 3,402,357 for Unovis, U.S. Federal Trademark Registration No. 3,402,369 for Unovis, and U.S. Federal Trademark Registration No. 3,527,965 for Unovis Solutions.

6.     The Defendant MSEI is an Oregon corporation having its principal place of business at 6024 SW Jean Road, Lake Oswego, OR 97035.

7.     The Defendant MSEI is a division of Biotronik, a German company.

8.     Botronik manufactures medical products such as pacemakers, defibrillator, catheters, and stents.

9.     The Defendant MSEI designs, manufactures, and tests pacemaker boards and defibrillator boards.

10.     The Defendant MSEI ships the pacemaker boards and defibrillator boards to Germany for final assembly.

11.     The Defendant Missouri is a Missouri corporation having its principal place of business at 1235 Beck Lane, Lebanon, MO 65536.

12.     The Defendant Missouri provides machine automation and replication, special machine design and manufacturing, concept and development, system upgrades and retrofits, motion controls and robotics, custom tooling and fixturing, and system integration.

13.     The Defendant MSEI and the Defendant Missouri are collectively referred

to as "Defendants".

## JURISDICTION AND VENUE

14.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C.
§ 1332 because the parties are citizens of different States and the amount in controversy
exceeds $75,000, exclusive of interest and costs.

15.     Moreover, this Court has supplemental subject matter jurisdiction over this
action pursuant to 28 U.S.C. § 1367(a).

16.     Under N.Y. C.P.L.R. 302(a)(1), this Court has personal jurisdiction over
the Defendant MSEI because the Defendant MSEI transacts business in the State of New
York and/or contracts to supply goods and services in the State of New York.

17.     The Defendant MSEI has visited the Plaintiff's business located in the
State of New York regarding work performed under an Equipment Purchase Agreement
A#2007-17 ("Equipment Purchase Agreement") between the Plaintiff and the Defendant
MSEI.

18.     Under N.Y. C.P.L.R. 302(a)(3), this Court has personal jurisdiction over
the Defendant MSEI because the Defendant MSEI has committed a tort outside the State
of New York that has caused injury to the Plaintiff within the State of New York.

19.     Under N.Y. C.P.L.R. 302(a)(3), this Court has personal jurisdiction over
the Defendant Missouri because the Defendant Missouri has committed a tort outside the
State of New York that has caused injury to the Plaintiff within the State of New York.

20.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b).

21.     The Plaintiff alleges that this district is proper since a substantial part of
the events giving rise to the claims occurred, or a substantial part of the property that is

the subject of the action is situated in this district.

## BACKGROUND

22.     The Plaintiff and the Defendant MSEI entered into an Equipment Purchase Agreement regarding a Test Handling System ("THS").  A copy of the Equipment Purchase Agreement is attached as Exhibit A of this Complaint.

23.     Pursuant to Section 17 of the Equipment Purchase Agreement, the effective date of the Equipment Purchase Agreement was June 12, 2007.

24.     The Equipment Purchase Agreement concerned the sale of THS products described in Exhibit A and Exhibit B of the Equipment Purchase Agreement.

25.     The Equipment Purchase Agreement also concerned THS products in connection with future purchase orders.

26.     Under Section 3.1 of the Equipment Purchase Agreement, each delivery of THS products was to be initiated by a written purchase order to the Plaintiff.

27.     Exhibit A of the Equipment Purchase Agreement provided information about the payment terms, delivery schedule, and pricing for the THS products.

28.     According to Exhibit A of the Equipment Purchase Agreement, the Defendant MSEI was obligated to make a down payment of $270,000.00 when a purchase order was issued.

29.     Exhibit A of the Equipment Purchase Agreement provided that the Defendant MSEI would pay $270,000.00 when the design phase was completed.

30.     Exhibit A of the Equipment Purchase Agreement also provided that the Defendant MSEI would pay $180,000.00 when the equipment was shipped from the Plaintiff.

31.     Exhibit A of the Equipment Purchase Agreement indicated that the Defendant MSEI would pay $180,000.00 when the equipment passed the final acceptance and when the equipment met the equipment performance criteria.

32.     Exhibit A of the Equipment Purchase Agreement stated that the Defendant MSEI would make a final payment of $150,000.00 by March 31, 2009.

33.     Exhibit A of the Equipment Purchase Agreement provided that the project cost for the first phase was $1,050,000.00.

34.     Exhibit A of the Equipment Purchase Agreement also provided that a second phase, including replication, crating and installation, would have a project cost of $350,000.00.

35.     The Plaintiff's original quotation for the THS products was $1,050,000.00.

36.     On or about June 15, 2007, the Defendant MSEI sent the Plaintiff Universal a Purchase Order No. 646339 regarding an automated THS for a first line of machines.  A copy of the Purchase Order No. 646339 is attached as Exhibit B of this Complaint.

37.     The Purchase Order No. 646339 was in connection with the Equipment Purchase Agreement.

38.     The Plaintiff's original quotation of $1,050,000.00 for the first THS line of machines increased by an additional amount of $157,493.00 due to subsequent change orders.

39.     The Plaintiff owned Pre-Existing Intellectual Property, including proprietary software, source code, and trade secret knowledge and know how utilized to develop Server Source Code.

40.     The Plaintiff's Server Source Code includes an extensive library of proprietary software code developed by Plaintiff for operation with special-purpose programing languages facilitating integration with relational database management systems, for sending and receiving equipment commands via associated command libraries, for displaying graphics in associated libraries, for operation with IP commands, and for facilitating IP messaging.

41.     The Server Source Code was not customized with any intellectual property from the Defendant MSEI.

42.     The Plaintiff's proprietary Server Source Code for the Plaintiff's computer program incorporated trade secrets.

43.     The Defendant MSEI did not own the Plaintiff's proprietary Server Source Code.

44.     The Plaintiff created THS Server Application software code configured to operate with Plaintiff's Server Source Code and facilitates manufacturing execution system communication, graphical representation of THS machines, management of THS equipment, and operation sequencing.

45.     The Plaintiff owned Pre-Existing Intellectual Property, including standardized software libraries and source code pertaining to machines in the THS line.

46.     The Plaintiff owned Pre-Existing Intellectual Property, including Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line, for material handling, host communication, input/output handling, pick and place routines, barcode scanning, matrix tray feeder handling, motion command, standardized human machine interface, head command, calibrations, feeder interface, and

database integration.

47.     The Polaris Jr. Source Code and software libraries for Polaris Jr. machines was not customized with any intellectual property from the Defendant MSEI.

48.     The Defendant MSEI did not own the Plaintiff's Polaris Jr. Source Code and software libraries for Polaris Jr. Machines.

49.     The Plaintiff created Polaris Jr. Application software code configured to operate with Plaintiff's Polaris Jr. Source Code and standardized software libraries and facilitate, temperature monitoring, device under test cataloging, fixture routing, traffic control, tester interfacing, THS server communications, and THS application specific human machine interfaces.

50.     The Plaintiff owned Pre-Existing Intellectual Property, including Polaris MP Source Code and standardized software libraries for a Polaris MP machine operable with the THS line, for material handling, host communication, input/output handling, pick and place routines, multi-head handling, vision guidance, barcode scanning, matrix tray feeder handling, motion command, standardized human machine interface, registration, fiducials, head command, calibrations, feeder interface, and database integration.

51.     The Polaris MP Source Code and software libraries for Polaris MP machines was not customized with any intellectual property from the Defendant MSEI.

52.     The Defendant MSEI did not own the Plaintiff's Polaris MP Source Code and software libraries for Polaris MP Machines.

53.     The Plaintiff created Polaris MP Application software code configured to operate with Plaintiff's Polaris MP Source Code and standardized software libraries, and

facilitate temperature monitoring, fixture routing, traffic control, THS server
communications, THS application specific human machine interfaces, and special vision
guidance for device under test to probe card alignment.

54.     The Plaintiff's Polaris Jr. machines can be adapted to replicate the
functionality of the Plaintiff's Polaris MP machine.

55.     The Plaintiff's Polaris Jr. Source Code can be adapted to replicate the
functionality of the Polaris MP Source Code.

56.     The Defendant MSEI was a customer of the Plaintiff.

57.     Generally, in the past, the Plaintiff has not provided customers with source
code.

58.     Section 5.7.8 of Exhibit B of the Equipment Purchase Agreement between
the Plaintiff and the Defendant MSEI indicated that "[s]ource code will not be provided."

59.     The Plaintiff was concerned about providing the source code to customers
because of the proprietary nature of the Plaintiff's intellectual property.

60.     The Plaintiff was also concerned about providing the source code to
customers because it could potentially lead to support problems.

61.     During the spring of 2008, the Plaintiff and the Defendant MSEI discussed
whether the Plaintiff would provide the Defendant MSEI with the source code.

62.     The Defendant MSEI requested that the Plaintiff provide the Defendant
MSEI with the source code in order to perform specified functions and to ensure long
term support of THS machines in case the Plaintiff could no longer provide support for
the THS line.

63.     The Plaintiff discussed with the Defendant MSEI the additional costs and

logistical difficulties associated with providing a portion of the Plaintiff's proprietary Server Source Code to enable the Defendant MSEI to perform specific functions.

64.     The Plaintiff was concerned that the Plaintiff's trade secrets could not be separated from the Plaintiff's proprietary Server Source Code.

65.     The Plaintiff's proprietary Server Source Code was not written in a format that would allow the trade secrets to be readily separated from the Plaintiff's proprietary Server Source Code.

66.     The Plaintiff was concerned that if the Defendant MSEI wrongfully provided the Plaintiff's proprietary Server Source Code to a third party such as a competitor, the competitor would have access to the Plaintiff's trade secrets.

67.     On or about May 19, 2008 and May 20, 2008, the Defendant MSEI attended a meeting at the Plaintiff's headquarters in the State of New York.

68.     One objective of the meeting, held between May 19, 2008 and May 20, 2008, was for the Defendant MSEI to review the status of the Test Handling System.

69.     Another objective of the meeting, held between May 19, 2008 and May 20, 2008, was for the Plaintiff and the Defendant MSEI to discuss the Defendant MSEI's requests for access to the Plaintiff's proprietary Server Source Code.

70.     Prior to the May 18-19, 2008 meeting, Defendant MSEI informed Plaintiff that the drivers for access to the THS source code were for long-term equipment support.

71.     On July 1, 2008, the Defendant MSEI attended a status meeting at the Plaintiff's headquarters in the State of New York.

72.     At a meeting, held on July 1, 2008, the Plaintiff informed the Defendant MSEI that the Plaintiff's proprietary Server Source Code should not be provided to third

party competitors because the third party competitors could gain access to the Plaintiff's trade secrets.

73.     The Defendant MSEI requested changes regarding the Test Handling System product line.

74.     The delivery date of the Test Handling System product line was delayed several times.

75.     In Section 4 of the Equipment Purchase Agreement of June 12, 2007, the Plaintiff provided warranties to the Defendant MSEI regarding the Test Handling System.

76.     On October 31, 2008, the Plaintiff sent the Defendant MSEI a letter regarding final acceptance of the Test Handling System line.  A copy of the final customer acceptance letter of October 31, 2008 is attached as Exhibit I.

77.     In the final customer acceptance letter of October 31, 2008, the Plaintiff provided as follows: "Unovis agrees to provide the THS server code as is with the understanding that MSEI assumes the risk of invalidating the warranty in the event a change by MSEI to the source code causes damage to any of the THS line hardware."

78.     Subsequently in 2008, the Plaintiff provided a copy of the Plaintiff's proprietary Server Source Code for the Plaintiff's computer program and trade secrets incorporated therein for the Defendant MSEI's internal use only and with the understanding that MSEI would only be utilizing the Server Source Code for long-term equipment support of the THS line.

79.     Section 8.2(d) of the Equipment Purchase Agreement provided "MSEI, MSEI's subcontractors, or suppliers, a non-exclusive, royalty-free, worldwide, perpetual license to, use, reproduce, display, of Pre-Existing Intellectual Property for MSEI's

internal use only."

80.     Contrary to Section 8.2(d) of the Equipment Purchase Agreement, the Defendant MSEI disclosed to the Defendant Missouri the Plaintiff's Pre-Existing Intellectual Property, including the Plaintiff's proprietary Server Source Code for the Plaintiff's computer program and the trade secrets incorporated therein, for the purpose of the Defendant Missouri competing against the Plaintiff.

81.     Contrary to Section 8.2(d) of the Equipment Purchase Agreement, the Defendant MSEI disclosed to the Defendant Missouri the Plaintiff's Pre-Existing Intellectual Property, including Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line, for the purpose of the Defendant Missouri competing against the Plaintiff.

82.     On or about the end of 2008, the Defendant MSEI requested a quote to develop and install add-ons to the original THS.

83.     The first original THS line had already been installed at the Defendant MSEI's Lake Oswego facility.

84.     The requested add-ons to the original THS line included incorporating additional machines into the original THS line extending the original THS line.

85.     In early 2009 and in response to the Defendant MSEI's request to develop and install add-ons to the original THS line, the Plaintiff generated Quotation No. 20175671 Revision D for $494,264.65.  A copy of the Quotation No. 20175671 Revision D is attached as Exhibit C.

86.     On or about the end of 2008, the Defendant MSEI requested a quote to develop and install a second duplicate THS line (hereinafter the second "THS2" line).

87.     The requested second THS2 line was to be an exact copy of the original THS line provided by the Plaintiff.

88.     In early 2009 and in response to the Defendant MSEI's request to develop and install a second duplicate THS2 line, the Plaintiff generated Quotation No. 20175626 Revision D for $1,281,556.90.  A copy of the Quotation No. 20175626 Revision D is attached as Exhibit D.

89.     After the Plaintiff generated quotes in response to the Defendant MSEI's requests for a duplicate THS2 line and for the add-ons to the original THS line, the Defendant MSEI also requested a proposal for developing and installing a separate surface mount line (hereinafter "SMT" line).

90.     The Plaintiff prepared a separate proposal and quote for the SMT line.

91.     The Defendant MSEI requested that quotes from the Plaintiff responding to all three requests (the add-ons to the original THS line, the development and installation of the duplicate second THS2 line, and the development and installation of the separate SMT line) be grouped together so an arrangement could be negotiated where the Plaintiff would be the Defendant MSEI's key automation supplier.

92.     The CEO's of the respective parties met to conduct such negotiations.

93.     The terms of the grouped quotes and primary supplier arrangement were laid out and compiled into a chart depicted in a PowerPoint presentation and reviewed by the respective CEO's during the meeting. The chart is provided as Exhibit Q.

94.     The negotiations resulted in a representation by the Defendant MSEI that the Plaintiff would handle the development and installation of all three projects (the add-ons to the original THS line, the duplicate second THS2 line, and the separate SMT line)

since the combined quote included a 36% discount and with the understanding that the second THS2 line purchase would be delayed by a few months and the add-ons to the first original THS line would then follow installation of the second THS2 line.

95.     The Defendant MSEI informed the Plaintiff of changes to the request to develop and install the SMT line.

96.     Accordingly, and with the understanding that the Plaintiff was going to handle the development and installation of all three projects, the Plaintiff contemplated the changes to the request to develop and install the SMT line and provided a revised Quotation No. 20175847 Revision G for $693,847.17 for the SMT line reflecting the 36% discount corresponding to the package deal of handling all three projects. A copy of the Quotation No. 20175847 Revision G is attached as Exhibit P.

97.     The Defendant MSEI understood the 36% discount associated with Quotation No. 20175847 Revision G for the SMT line reflected an understanding by the Plaintiff that the Plaintiff would handle the development and installation of all three projects (the add-ons to the original THS line, the duplicate second THS2 line, and the separate SMT line).

98.     Acting upon the representation by Defendant MSEI that the Plaintiff would handle the development and installation of all three projects, the Plaintiff's Quotation No. 20175847 Revision G for the SMT line resulted in a very low profit margin.

99.     The Plaintiff intended to use a portion of the margin for the SMT line to offset the cost of the second THS2 line.

100.    The Defendant MSEI accepted the Plaintiff's severely reduced bid for the

13

SMT line and a formal Equipment Purchase Agreement No. 2007-51 indicating the same was effectuated by the Defendant MSEI and the Plaintiff Universal on March 25, 2009.

101.    A few months later in 2009, when the Plaintiff received the formal Specification for the THS2 line, the content had changed to include additional hardware for a second Adapts Tester and a Shaker Tester forcing a need for the Plaintiff to re-quote the second THS2 line.

102.    The first original THS line of machines did not include a second Adapts tester with radio frequency and Shaker stations.

103.    On or about August 7, 2009, the Plaintiff submitted a Quotation No. 20183396 for $2,958,465.36 to the Defendant MSEI.  A copy of the Quotation No. 20183396 is attached as Exhibit E.

104.    The Quotation No. 20183396 was a Re-Quote reflecting the changes to the THS2 line Specification and honoring the discount levels corresponding to the package deal of the Plaintiff handling all three projects (the add-ons to the original THS line, the duplicate second THS2 line, and the separate SMT line) for the Defendant MSEI.

105.    The Plaintiff was informed that the Defendant MSEI would not accept the Plaintiff's Re-Quote No. 20183396 for the second THS2 line of machines.

106.    The Defendant MSEI requested a quote from the Plaintiff for a second Polaris Jr. and a second Adapts tester.

107.    On or about January 29, 2010, the Plaintiff submitted a Quotation No. 20189975 for $371,097.22 to the Defendant MSEI.  A copy of the Quotation No. 20189975 is attached as Exhibit F.

108.    Quotation No. 20183396 and Quotation No. 20189975 included costs for a

second Polaris Jr. and a second Adapts tester.

109.    The Plaintiff was informed that the Defendant MSEI would not accept the Plaintiff's Quotation No. 20189975 for the second Polaris Jr. and the second Adapts tester.

110.    Upon information and belief, the Defendant Missouri submitted a quotation for the second THS2 line of machines to the Defendant MSEI.

111.    Upon information and belief, the quotation of the Defendant Missouri for the second THS2 line was substantially lower than the Plaintiff's quotation, at least in part, because the Defendant Missouri had not invested significant money and resources in developing source code corresponding to the second THS2 line.

112.    The Defendant MSEI awarded the project for the second THS2 line of machines to the Defendant Missouri.

113.    In 2012, the Defendant MSEI requested a proposal for a third THS3 line of machines.

114.    On or about August 7, 2012, the Plaintiff generated a Quotation No. 20222102 Rev. A for $2,260,338.53 regarding a third THS3 line of machines.  A copy of the Quotation No. 20222102 Rev. A is attached as Exhibit G.

115.    The Plaintiff provided the Defendant MSEI with a Proposal reflecting the costs associated with Quotation No. 20222102 Rev. A, to develop and install the third THS3 line.  A copy of the Proposal is attached as Exhibit H.

116.    Upon information and belief, the Defendant Missouri submitted a quotation for a third THS line of machines to the Defendant MSEI.

117.    Upon information and belief, the quotation of the Defendant Missouri for

the third THS line was substantially lower than the Plaintiff's quotation, at least in part, because the Defendant Missouri had not invested significant money and resources in developing source code corresponding to the third THS line.

118.    The Plaintiff was informed that the Defendant MSEI would not accept the Plaintiff's proposal for the third THS3 line of machines.

119.    Upon information and belief, the Defendant MSEI awarded the project for the third THS3 line of machines to the Defendant Missouri.

120.    In late fall of 2012, the Plaintiff Universal learned, upon information and belief, that the Defendant MSEI had given the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, and the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the first THS line and adaptable for a Polaris MP machine operable with the first THS line to the Defendant Missouri.

121.    In the spring of 2013, the Defendant Missouri confirmed to the Plaintiff that the Defendant Missouri utilized the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, and the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the first THS line and adaptable for a Polaris MP machine operable with the first THS line when developing and installing the second THS2 line.

122.    In the spring of 2013, the Defendant Missouri confirmed to the Plaintiff that the Defendant Missouri intended to utilize the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets

incorporated therein, and the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the first THS line and adaptable for a Polaris MP machine operable with the first THS line when developing and installing the third THS3 line.

### COUNT I – Breach of Contract

123.    The Plaintiff repeats and realleges the allegations in paragraphs 1-122 as if fully set forth herein.

124.    The Plaintiff and the Defendant MSEI entered into an Equipment Purchase Agreement that was valid contract.

125.    The Equipment Purchase Agreement was binding on the Defendant MSEI.

126.    The Plaintiff fully performed the Plaintiff's obligations pursuant to the Equipment Purchase Agreement.

127.    The Defendant MSEI breached Sections 8.2(d) of the Equipment Purchase Agreement.

128.    The Defendant MSEI exceeded the license under section 8.2(b) of the Equipment Purchase Agreement.

129.    Section 8.2(d) of the Equipment Purchase Agreement provided as follows: "If the Seller uses any Pre-Existing Intellectual Property in connection with this Agreement, the Seller hereby grants MSEI, MSEI's subcontractors, or suppliers, a non-exclusive license, royalty-free, worldwide, perpetual license to, use, reproduce, display, of the Pre-Existing Intellectual Property for MSEI's internal use only."

130.    Under the Equipment Purchase Agreement, the Plaintiff was the "Seller".

131.    Under Section 8.2 (a) of Equipment Purchase Agreement, "Pre-existing

Intellectual Property" was defined as "any trade secret, invention, work of authorship, mask work or protectable design that has already been conceived or developed by anyone other than MSEI before Seller renders any services under this Agreement."

132.    According to Section 8.2(b) of the Equipment Purchase Agreement, the Plaintiff did not "by rendering services under" the Equipment Purchase Agreement "agree to assign, transfer, or exclusively license the" Plaintiff's "Pre-existing Intellectual Property to MSEI."

133.    The Defendant MSEI breached Section 8.2(d) of the Equipment Purchase Agreement by disclosing the Plaintiff's Server Source Code and incorporated trade secrets to the Defendant Missouri for the purpose of creating a second line machine and a third line machine with the Plaintiff's proprietary Server Source Code and trade secrets.

134.    The Defendant MSEI breached Section 8.2(d) of the Equipment Purchase Agreement by disclosing the Plaintiff's proprietary Server Source Code and trade secrets to the Defendant Missouri for the purpose of the Defendant Missouri competing with the Plaintiff for work.

135.    The Defendant MSEI breached Section 8.2(d) of the Equipment Purchase Agreement by disclosing the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with THS line, for the purpose of creating a second line machine and a third line machine with the Plaintiff's proprietary Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines.

136.    The Defendant MSEI breached Section 8.2(d) of the Equipment Purchase Agreement by disclosing the Plaintiff's proprietary Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line to the

Defendant Missouri for the purpose of the Defendant Missouri competing with the Plaintiff for work.

137.    The Plaintiff has incurred damages as a direct result of the breach of the Equipment Purchase Agreement by the Defendant MSEI.

138.    The Plaintiff incurred damages in the amount to be determined at trial, but no less than $1,378,930.00 in damages.

## COUNT II – Misappropriation of Trade Secrets

139.    The Plaintiff repeats and realleges the allegations in paragraphs 1-122 and 123-138 as if fully set forth herein.

140.    The Plaintiff has a trade secret source code, incorporated into the Plaintiff's proprietary Server Source Code.

141.    In the Plaintiff's business, the Plaintiff has taken steps to maintain the secrecy of the Plaintiff's proprietary Server Source Code.

142.    In the Plaintiff's business, the Plaintiff's employees have limited access to the Plaintiff's proprietary Server Source Code.

143.    The Plaintiff implemented a Confidential Information Policy that restricts employee access to confidential information on a need to know basis.  A copy of the Confidential Information Policy of October 11, 2005 is attached as Exhibit L.

144.    The Plaintiff's Confidential Information Policy of October 11, 2005 provides that the Plaintiff's employees must have a legitimate reason to access confidential information.

145.    The Plaintiff's Confidential Information Policy of October 11, 2005 provides that confidential information is stored in a controlled environment, such as a

locked filed cabinet or desk drawer, or a secure personal computer.

146.    The Plaintiff's Confidential Information Policy of October 11, 2005 restricts the Plaintiff's employees from leaving confidential information unattended on desks, copiers, and fax machines.

147.    The Plaintiff's Confidential Information Policy of October 11, 2005 provides that the computer screens are password protected.

148.    The Plaintiff's Confidential Information Policy of October 11, 2005 provides that employees should not release confidential information without review by a manager or director.

149.    The Plaintiff's Confidential Information Policy of October 11, 2005 provides that employees should refrain from removing confidential information off the premises of the corporation, to the extent possible.

150.    The Plaintiff has restricted access to servers.

151.    The Plaintiff has limited access to protected servers and databases through passwords.

152.    The Plaintiff has designated which groups of employees in the corporation will have access to specified server space.

153.    The Plaintiff's information technology personnel control and limit access to protected allocated server space.

154.    When the Plaintiff hires employees, the Plaintiff's employees sign employment agreements regarding the confidentiality of the Plaintiff's proprietary intellectual property.  A copy of a Universal Instruments Corporation Employee Intellectual Property and Confidential Information Agreement is attached as Exhibit N

and a copy of Confidential, Non-Competition and Intellectual Property Agreement is attached as Exhibit O.

155.    The Universal Instruments Corporation Employee Intellectual Property and Confidential Information Agreement and the Confidential, Non-Competition and Intellectual Property Agreement must be executed in consideration of employment.

156.    Paragraph 4 of the Universal Instruments Corporation Employee Intellectual Property and Confidential Information Agreement provides that the employee agrees "[n]ot to disclose directly or indirectly to any unauthorized person without Universal's prior written permission at any time during or subsequent to" the employee's "employment with Universal any knowledge not available to the public which" the employee acquires "respecting Universal's Intellectual Property or any Confidential Information regardless of its source, including but not limited to designs, methods, improvements, product development plans, trade secrets, software . . . acquired in the course of employment."

157.    Paragraph 4 of the Universal Instruments Corporation Employee Intellectual Property and Confidential Information Agreement provides that all tangible forms of Universal's Intellectual Property or any Confidential Information must be "returned to Universal or destroyed at" Universal's "request upon termination of" employment with Universal.

158.    Paragraph 1 of the Plaintiff's Confidential, Non-Competition and Intellectual Property Agreement limits an employee's ability to disseminate or disclose confidential information during or after employment with the Plaintiff.

159.    Paragraph 1 of the Plaintiff's Confidential, Non-Competition and

Intellectual Property Agreement requires the employee to return confidential information upon termination of employment.

160.     Under paragraph 1 of the Plaintiff's Confidential, Non-Competition and Intellectual Property Agreement, confidential information includes, but is not limited to plans, procedures, products, processes, trade secrets, and software programs.

161.     The Plaintiff's proprietary Server Source Code was not readily known outside the Plaintiff's business.

162.     The Plaintiff's Confidential Information Policy of October 11, 2005 provides that confidential information "may only be released to an outside (non-Universal) party with the appropriate approval".

163.     On or about March 14, 2011, the Plaintiff instituted a confidential information policy (hereinafter referred to as "Plaintiff's Confidential Information Policy of March 14, 2011").  A copy of the Plaintiff's Confidential Information Policy of March 14, 2011 is attached as Exhibit M.

164.     The Plaintiff's Confidential Information Policy of March 14, 2011 provides that confidential information must: "not be left unattended on desks, copy or fax machines, printers, etc. or displayed on" personal computer "monitors when not is use."

165.     The Plaintiff's Confidential Information Policy of March 14, 2011 provides that confidential information must: "be stored in a controlled environment, such as locked file cabinet or desk drawer, or a secure" personal computer.

166.      The Plaintiff's Confidential Information Policy of March 14, 2011 provides that confidential information should remain on the premises to the extent possible.

167.     The Plaintiff's Confidential Information Policy of March 14, 2011 provides that confidential information should be restricted to employees, who have a legitimate need to know the confidential information.

168.     The Plaintiff's Confidential Information Policy of March 14, 2011 provides that employees must reproduce documents with all restrictive confidential marking.

169.     According to the Plaintiff's Confidential Information Policy of March 14, 2011, emails must indicate whether the information contained therein is confidential.

170.     The Plaintiff's Confidential Information Policy of March 14, 2011 provides guideline illustrations to employees for restricting access of confidential information to suppliers, vendors, and service providers.

171.     The Plaintiff restricts building access to protect trade secrets and proprietary information.

172.     The Plaintiff has instituted building access and personnel identification policies.  A copy of the Building Access and Personnel Identification Policy of June 13, 2006 is attached as Exhibit J.  A copy of a Building Access and Personnel Identification Policy of June 3, 2009 is attached as Exhibit K.

173.     The Plaintiff requires personnel identification for building access.

174.     The Plaintiff requires suppliers and contractors to obtain specific approval for building access to the Plaintiff's headquarter home location and other locations.

175.     The Plaintiff uses passwords to restrict access to confidential information and trade secrets.

176.     The Plaintiff implemented a Password Policy of September 8, 2005.

177.    Outside of the Plaintiff's business, the Plaintiff's proprietary Server Source Code was disclosed to the Defendant MSEI for internal use only and with the understanding that MSEI would only be utilizing the Server Source Code for long-term equipment support of the THS line.

178.    The Plaintiff expended a great deal of money and efforts to develop the Plaintiff's proprietary Server Source Code.

179.    The Plaintiff has spent at least $1,378,930.00 for engineering labor to develop the Plaintiff's proprietary source code operable with the THS line.

180.    The Plaintiff's proprietary source code is used in the continuous operation of the Plaintiff's business.

181.    The Plaintiff creates new lines using the Plaintiff's proprietary source code.

182.    The Plaintiff's proprietary source code could not to be readily obtained through other means.

183.    The Plaintiff created the Plaintiff's proprietary source code over the course of several months.

184.    The Plaintiff's trade secrets could not be properly duplicated or acquired without obtaining information from the Plaintiff.

185.    The Defendant MSEI and the Defendant Missouri misappropriated the Plaintiff's trade secrets in the Plaintiff's proprietary software.

186.    The Defendant MSEI improperly used the Plaintiff's proprietary source code outside the scope of the Equipment Purchase Agreement.

187.    The Defendant MSEI breached Section 8.2(d) of the Equipment Purchase

Agreement.

188.   Upon information and belief, the Defendant disclosed the Plaintiff's proprietary source code to the Defendant Missouri for improper use of the Plaintiff's proprietary source code outside the scope of the Equipment Purchase Agreement.

189.   Upon information and belief, the Defendant Missouri has improperly used the Plaintiff's proprietary source code with knowledge that the Plaintiff's proprietary source code incorporated trade secrets.

190.   Upon information and belief, the Defendant Missouri knew that the Defendant MSEI had entered into the Equipment Purchase Agreement with the Plaintiff.

191.   The Defendant MSEI is using the Plaintiff's proprietary source code in breach of the Equipment Purchase Agreement.

192.   The Defendant MSEI is using the Plaintiff's proprietary source code in breach of a confidential relationship.

193.   The Plaintiff was actually damaged by the Defendants' misappropriation of the Plaintiff's trade secrets in the Plaintiff's proprietary source code.

194.   The Plaintiff was not awarded the project for the second THS2 line of machines because the Defendant MSEI gave the Plaintiff's proprietary source code to the Defendant Missouri.

195.   The Plaintiff was not awarded the project for the third THS3 line of machines because the Defendant MSEI gave the Plaintiff's proprietary source code to the Defendant Missouri.

196.   The Defendant Missouri was a competitor of the Plaintiff.

197.   The Defendant Missouri acquired unjust profits based on the receipt of the

Plaintiff's proprietary source code.

198.    The Plaintiff anticipated profits of at least $800,000.00 from revenue collected for developing and installing the second THS2 line.

199.    The Plaintiff anticipated profits of at least $800,000.00 from revenue collector for developing and installing the third THS3 line.

200.    The Defendant Missouri was able to underbid the Plaintiff for work pertaining to the second THS2 line because the Defendant Missouri had not expended costs in developing the Plaintiff's proprietary source code.

201.    The Defendant Missouri was able to underbid the Plaintiff for work pertaining to the third THS3 line because the Defendant Missouri had not expended costs in developing the Plaintiff's proprietary source code.

### COUNT III – Unfair Competition

202.    The Plaintiff repeats and realleges the allegations in paragraphs 1-122, 123-138, and 139-201 as if fully set forth herein.

203.    The Defendant MSEI received the Plaintiff's Pre-existing Intellectual Property including proprietary Server Source Code software and incorporated trade secret software code.

204.    The Defendant MSEI received the Plaintiff's Pre-Existing Intellectual Property including Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line.

205.    The Defendant MSEI received Plaintiff's Pre-Existing Intellectual Property, including Polaris MP Source Code and standardized software libraries for a Polaris MP machine operable with the THS line.

206.    The Defendant MSEI improperly disclosed the Plaintiff's Pre-existing Intellectual Property including proprietary Server Source Code software and incorporated trade secret software code to the Defendant Missouri for use in a second THS line and a third THS line machine.

207.    The Defendant MSEI has knowingly disclosed the Plaintiff's Pre-existing Intellectual Property including proprietary Server Source Code software and incorporated trade secret software code to the Defendant Missouri to enable the Defendant Missouri to improperly use the Plaintiff's Pre-existing Intellectual Property including proprietary Server Source Code software and incorporated trade secret software code to unfairly compete against the Plaintiff.

208.    The Defendant Missouri knowingly used the Plaintiff's Pre-existing Intellectual Property including proprietary Server Source Code software and incorporated trade secret software code to prepare bids and unfairly compete against the Plaintiff.

209.    The Defendant MSEI improperly disclosed the Plaintiff's Pre-existing Intellectual Property including Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line to the Defendant Missouri for use in a second line machine and a third line machine.

210.    The Defendant MSEI has knowingly disclosed the Plaintiff's Pre-existing Intellectual Property including Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line to the Defendant Missouri to enable the Defendant Missouri to improperly use the Plaintiff's Pre-existing Intellectual Property including Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line to unfairly compete against the Plaintiff.

211.    The Defendant Missouri knowingly used the Plaintiff's Pre-existing Intellectual Property including Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line to prepare bids and unfairly compete against the Plaintiff.

212.    The Defendant MSEI improperly disclosed the Plaintiff's Pre-existing Intellectual Property including Polaris Jr. Source Code and standardized software libraries to the Defendant Missouri for adapting the same for controlling a second line machine and a third line machine.

213.    The Defendant MSEI has knowingly disclosed the Plaintiff's Pre-existing Intellectual Property including Polaris Jr. Source Code and standardized software libraries to the Defendant Missouri to enable the Defendant Missouri to improperly use and adapt the Plaintiff's Pre-existing Intellectual Property including Polaris Jr. Source Code and standardized software libraries to unfairly compete against the Plaintiff.

214.    The Defendant Missouri knowingly used the Plaintiff's Pre-existing Intellectual Property including Polaris Jr. Source Code and standardized software libraries to prepare bids and unfairly compete against the Plaintiff.

215.    The Plaintiff has been damaged by the unfair competition of the Defendant MSEI.

216.    The Plaintiff has been damaged by the unfair competition of the Defendant Missouri.

217.    The Plaintiff has suffered over $2,978,930.00 in damages due to the unfair competition of the Defendant MSEI and the Defendant Missouri.

218.    The Plaintiff will continue to incur damages as a proximate result of the

unfair competition of the Defendant MSEI and the Defendant Missouri.

## COUNT IV – Unjust Enrichment

219.     The Plaintiff repeats and realleges the allegations in paragraphs 1-122, 123-138, and 139-201 and 202-218 as if fully set forth herein.

220.     The Defendant MSEI disclosed to the Defendant Missouri the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line.

221.     The Defendant Missouri received an unjust financial competitive benefit from the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line and/or confidential information.

222.     The unjust financial competitive benefit includes the Defendant Missouri's use of the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line and/or confidential information.

223.     The Defendant Missouri was able to underbid the Plaintiff for projects

because the Defendant Missouri did not incur any costs in the development of the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line.

224.    The Defendant Missouri was awarded the project of the Defendant MSEI.

225.    The Plaintiff developed the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line at great financial expense.

226.    The Plaintiff has lost the expectation of financial revenue from the development of the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line.

227.    The Defendant Missouri is not entitled to any legal or equitable rights in the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line.

228.    It is inequitable for the Defendant Missouri to retain the financial

competitive benefit acquired from the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line.

229.    The Plaintiff is entitled to an award commensurate to the amount of unjust enrichment received from the Defendant Missouri.

230.    The Plaintiff is entitled to an award that disgorges the Defendant Missouri of the financial competitive benefit obtained from the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line.

231.    The Plaintiff is entitled to an award that disgorges the Defendant Missouri of any financial benefit obtained from the sale of goods or services derived from misappropriation of the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line and adaptable for a Polaris MP machine operable with the THS line.

232.    The Plaintiff is entitled to an award that disgorges the Defendant MSEI of any financial gains acquired through misappropriation of the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade

secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized

software libraries for Polaris Jr. machines operable with the THS line and adaptable for a

Polaris MP machine operable with the THS line.

## COUNT V – Promissory Estoppel

233.     The Plaintiff repeats and realleges the allegations in paragraphs 1-122,

123-138, and 139-201 and 202-218 and 219-232 as if fully set forth herein.

234.     On or about the end of 2008, the Defendant MSEI requested a quote to

develop and install add-ons to the original THS.

235.     The first original THS line had already been installed at the Defendant

MSEI's Lake Oswego facility.

236.     The requested add-ons to the original THS line included incorporating

additional machines into the original THS line extending the original THS line.

237.     In early 2009 and in response to the Defendant MSEI's request to develop

and install add-ons to the original THS line, the Plaintiff generated Quotation No.

20175671 Revision D for $494,264.65.  A copy of the Quotation No. 20175671 Revision

D is attached as Exhibit C.

238.     On or about the end of 2008, the Defendant MSEI requested a quote to

develop and install a second duplicate THS line (hereinafter the second "THS2" line).

239.     The requested second THS2 line was to be an exact copy of the original

THS line provided by the Plaintiff.

240.     In early 2009 and in response to the Defendant MSEI's request to develop

and install a second duplicate THS2 line, the Plaintiff generated 20175626 Revision D for

$1,281,556.90.  A copy of the Quotation No. 20175626 Revision D is attached as Exhibit D.

241.    After the Plaintiff generated quotes in response to the Defendant MSEI's requests for a duplicate THS2 line and for the add-ons to the original THS line, the Defendant MSEI also requested a proposal for developing and installing a separate surface mount line (hereinafter "SMT" line).

242.    The Plaintiff prepared a separate proposal and quote for the SMT line.

243.    The Defendant MSEI requested that quotes from the Plaintiff responding to all three requests (the add-ons to the original THS line, the development and installation of the duplicate second THS2 line, and the development and installation of the separate SMT line) be grouped together so an arrangement could be negotiated where the Plaintiff would be the Defendant MSEI's key automation supplier.

244.    The CEO's of the respective parties met to conduct such negotiations.

245.    The terms of the grouped quotes and primary supplier arrangement were laid out and compiled into a chart depicted in a PowerPoint presentation and reviewed by the respective CEO's during the meeting. The chart is provided as Exhibit Q.

246.    The negotiations resulted in a representation by the Defendant MSEI that the Plaintiff handle the development and installation of all three projects (the add-ons to the original THS line, the duplicate second THS2 line, and the separate SMT line) since the combined quote included a 36% discount and with the understanding that the second THS2 line purchase would be delayed by a few months and the add-ons to the first original THS line would then follow installation of the second THS2 line.

247.    The Defendant MSEI informed the Plaintiff of changes to the request to

33

develop and install the SMT line.

248.    Accordingly, and with the understanding that the Plaintiff was going to

handle the development and installation of all three projects, the Plaintiff contemplated

the changes to the request to develop and install the SMT line and provided a revised

Quotation No. 20175847 Revision G for $693,847.17 for the SMT line reflecting the 36%

discount corresponding to the package deal of handling all three projects. A copy of the

Quotation No. 20175847 Revision G is attached as Exhibit P.

249.    The Defendant MSEI understood the 36% discount associated with

Quotation No. 20175847 Revision G for the SMT line reflected an understanding by the

Plaintiff that the Plaintiff would handle the development and installation of all three

projects (the add-ons to the original THS line, the duplicate second THS2 line, and the

separate SMT line).

250.    Acting upon the affirmative assurances by Defendant MSEI that the

Plaintiff would handle the development and installation of all three projects, the

Plaintiff's Quotation No. 20175847 Revision G for the SMT line resulted in a very low

profit margin.

251.    The Plaintiff intended to use a portion of the margin for the SMT line to

offset the cost of the second THS2 line.

252.    The Defendant MSEI accepted the Plaintiff's severely reduced bid for the

SMT line and a formal Equipment Purchase Agreement No. 2007-51 indicating the same

was effectuated by the Defendant MSEI and the Plaintiff Universal on March 25, 2009.

253.    A few months later in 2009, when the Plaintiff received the formal

Specification for the THS2 line, the content had changed to include additional hardware

for a second Adapts Tester and a Shaker Tester forcing a need for the Plaintiff to re-quote the second THS2 line.

254.     The first original THS line of machines did not include a second Adapts tester with radio frequency and Shaker stations.

255.     On or about August 7, 2009, the Plaintiff submitted a Quotation No. 20183396 for $2,958,465.36 to the Defendant MSEI.  A copy of the Quotation No. 20183396 is attached as Exhibit E.

256.     The Quotation No. 20183396 was a Re-Quote reflecting the changes to the THS2 line Specification and honoring the discount levels corresponding to the package deal of the Plaintiff handling all three projects (the add-ons to the original THS line, the duplicate second THS2 line, and the separate SMT line) for the Defendant MSEI.

257.     The Plaintiff was informed that the Defendant MSEI would not accept the Plaintiff's Re-Quote No. 20183396 for the second THS2 line of machines.

258.     The Defendant MSEI's conduct in refusing to accept the Plaintiff's discount-honoring bid for the second THS2 line constituted an action that was detrimental to Plaintiff because of the reliance the Plaintiff had put on Defendant MSEI's representation that the Plaintiff's discount-honoring bid for the second THS2 line would be accepted by the Defendant MSEI in conjunction with the package deal represented by the Defendant MSEI for the Plaintiff to handle all three projects.

259.     The Defendant MSEI's refusal to accept the Plaintiff's bid for the second THS2 line prevented the Plaintiff from obtaining the profit margins that Plaintiff had relied upon obtaining by handling all three projects.

260.     The Defendant MSEI's refusal to accept the Plaintiff's bid for the second

THS2 line prevented the Plaintiff from recouping the severely diminished and detrimental margins associated with Plaintiffs discounted bid for the SMT line.

261.    The Plaintiff's reliance on the Defendant MSEI's representations of the package deal and the associated margins the Plaintiff intended to realized by handling all three projects was reasonably foreseeable by the Defendant MSEI.

262.    The relied upon margins the Plaintiff intended to realize by handling all three projects were prevented from occurring when the Defendant MSEI's conduct changed and the Plaintiff's bid for the second THS2 line was refused.

263.    The natural consequence of the representations by the Defendant MSEI that the Plaintiff handle all three projects would have allowed the Plaintiff to realize profit associated with all three projects as a whole, thereby facilitating a way for the Plaintiff to offset the low margin associated with the bid for the SMT line.

264.    Relying upon the Defendant's promises for additional business as agreed upon in the bundled arrangement, the Plaintiff provided a $404,764.34 discount on the SMT line.

265.    The Plaintiff did not recover this discounted amount as relied upon when the Defendant MSEI obtained the THS2 line from the Defendant MTA.

266.    Thus, the Plaintiff was damaged in the amount of at least $404,764.34 as a result of its reliance upon the Defendant's promised agreement for production of the additional machines for the THS1 line as well as the THS2 line.

267.    The Plaintiff Universal is entitled to and award of damages commensurate with the profit lost in reliance of the Defendant MSEI's affirmative assurances that the Plaintiff would handle development and installation of all three projects (the add-ons to

the original THS line, the duplicate second THS2 line, and the separate SMT line), for the Defendant MSEI.

**WHEREFORE**, the Plaintiff prays:

a)     For a judgment that the Defendant MSEI has breached the Equipment Purchase Agreement;

b)     For a judgment that the Defendants have engaged in trade secret misappropriation;

c)     For a judgment that the Defendants have engaged in unfair competition under New York common law;

d)     For a judgment against the Defendants for unjust enrichment;

e)     For a judgment against the Defendant based on promissory estoppel;

f)     This Court award damages to the Plaintiff resulting from the Defendants' breach of contract, including but not limited to compensatory damages to place the Plaintiff in a position that the Plaintiff would have been in had the Defendant MSEI performed under the Equipment Purchase Agreement;

g)     This Court award the Plaintiff any consequential damages that are a probable result of the Defendant MSEI's breach of contract;

h)     This Court award the Plaintiff's actual damages for trade secret misappropriation, including but not limited to the Plaintiff's revenues lost as a result of the Defendants' trade secret misappropriation of the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's

proprietary Server Source Code and trade secrets incorporated therein, the

Plaintiff's Polaris Jr. Source Code and standardized software libraries for

Polaris Jr. machines operable with the THS line, and adaptable for

Plaintiff's Polaris MP machine operable with the THS line, and the

Plaintiff's costs incurred in developing the Plaintiff's Pre-Existing

Intellectual Property including the Plaintiff's proprietary Server Source

Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr.

Source Code and standardized software libraries for Polaris Jr. machines

operable with the THS line, and adaptable for Plaintiff's Polaris MP

machine operable with the THS line;

i)      This Court award the Defendants' profits unjustly gained as a result of the

Defendants' trade secret misappropriation;

j)      This Court award a reasonable royalty to the Plaintiff for the Defendants'

trade secret misappropriation of proprietary software, including but not

limited to a fee that the Plaintiff would have hypothetically negotiated

with the Defendants as a license for the proprietary software at the time of

misappropriation;

k)      This Court award damages commensurate with the profit lost in reliance

of the Defendant MSEI's affirmative assurances that the Plaintiff would

handle development and installation of three projects: 1) add-ons to the

original THS line, 2) a duplicate second THS2 line, and 3) a separate SMT

line), for the Defendant MSEI.

l)      This Court permanently enjoins the Defendant MSEI from using the

Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line, and the Plaintiff's Polaris MP Source Code and standardized software libraries for a Polaris MP machine operable with the THS line in connection with the third machine line and any future lines of machines;

m)   This Court permanently enjoins the Defendant Missouri from using the Plaintiff's Pre-Existing Intellectual Property including the Plaintiff's proprietary Server Source Code and trade secrets incorporated therein, the Plaintiff's Polaris Jr. Source Code and standardized software libraries for Polaris Jr. machines operable with the THS line, and the Plaintiff's Polaris MP Source Code and standardized software libraries for a Polaris MP machine operable with the THS line in connection with the third machine line and any future lines of machines; and

n)   This Court grants such other relief as this Count deems just and appropriate.

## JURY DEMAND

The Plaintiff demands a trial by jury on all issues properly tried to a jury.


DATED: July 15, 2013

                 s/Jonathan M. Madsen
                Jonathan M. Madsen, Bar No. 662011
                Attorney for Plaintiff
                Schmeiser, Olsen & Watts LLP
                22 Century Hill Drive, Ste. 302
                Latham, New York 12110
                Telephone: (518) 220-1850
                Facsimile: (518) 220-1857
                E-mail: jmadsen@iplawusa.com
                E-mail: aminor@iplawusa.com