**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**UNIVERSAL INSTRUMENTS**
**CORPORATION,**

|  |  |
|---|---|
| **Plaintiff,** | **3:13-cv-831** **(GLS/DEP)** |
| **v.** | |
| **MICRO SYSTEM ENGINEERING,** **INC. et al.,** | |
| **Defendants.** | |

_____

**MICRO SYSTEM ENGINEERING,**
**INC.,**

|  |  |
|---|---|
| **Plaintiff,** | **3:13-cv-1144** **(GLS/DEP)** |
| **v.** | |
| **UNIVERSAL INSTRUMENTS** **CORPORATION,** | |
| **Defendant.** | |

_____

**APPEARANCES:**                    **OF COUNSEL:**

**FOR UNIVERSAL INSTRUMENTS CORPORATION:**

| Schmeiser, Olsen Law Firm | ARLEN L. OLSEN, ESQ. |
|---|---|
| 22 Century Hill Drive | CHRISTOPHER E. BLANK, ESQ. |
| Suite 302 | JARED L. DUJACK, ESQ. |
| Latham, NY 12110 | VICTOR J. BARANOWSKI, ESQ. |

**FOR MISCROSYSTEMS ENGINEERING, INC. and MISSOURI TOOLING**
**AND AUTOMATION**

Kolisch, Hartwell Law Firm
200 Pacific Building
520 Southwest Yamhill Street
Portland, OR 97204

DAVID P. COOPER, ESQ.
DESMOND J. KIDNEY, ESQ.
OWEN W. DUKELOW, ESQ.

Young, Sommer Law
Executive Woods
5 Palisades Drive
Albany, NY 12205

JEFFREY S. BAKER, ESQ.
JOSEPH F. CASTIGLIONE,
ESQ.

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff/consolidated defendant Universal Instruments Corporation commenced this action against defendant/consolidated plaintiff Micro System Engineering, Inc. (MSEI) and defendant Missouri Tooling and Automation (MTA) for copyright infringement, breach of contract, misappropriation of trade secrets, unfair competition, unjust enrichment, and promissory estoppel. (*See generally* 3d Am. Compl., Dkt. No. 103.[1]) MSEI commenced a separate action against Universal alleging breach of the duty of confidentiality, unfair competition, misappropriation of trade secrets, and "an injunction." (*See generally* Compl., Dkt. No. 1, 3:13-cv-

---

[1] Unless otherwise specified, citations are to 3:13-cv-831.

2

1144.)  The two actions were consolidated, and the earlier-filed designated as the lead.  (Dkt. No. 26.)  Pending are MSEI and MTA's motions for judgment on the pleadings, to dismiss, to strike, and for summary judgment.  (Dkt Nos. 80, 97, 107, 196.)  Also pending is Universal's cross motion for partial summary judgment.  (Dkt. No. 209.)

## II.  <u>Background</u>

**A.    <u>Facts</u>**[2]

MSEI manufactures and tests components used in pacemakers and defibrillators that are implanted into patients' chests.  (Defs.' Statement of Material Facts (SMF) ¶ 1, Dkt. No. 200.)  Universal develops automation platforms for companies, like MSEI, in the electronic manufacturing industry.  (Pl.'s Supplemental (Supp.) SMF ¶ 1, Dkt. No. 213; 3d Am. Compl. ¶¶ 3-4.)  MTA is a competitor of Universal and also designs machine automation and provides system upgrades, retrofits, and custom tooling.  (3d Am. Compl. ¶¶ 12, 247; Dkt. No. 67 ¶¶ 12, 74.)

MSEI owned machines that manually tested its products and wanted to upgrade this equipment to operate automatically.  (Defs.' SMF ¶ 2.)  MSEI planned to introduce the upgraded machines in phases to gradually

---

[2]  Unless otherwise noted, the facts are undisputed.

3

create a fully automated system to be called the Test Handling System (THS).  (*Id.* ¶¶ 8, 10.)  In order to do so, MSEI initially developed an automation design in 2002.  (*Id.* ¶ 3.)  MSEI contends that this design contained intellectual property consisting of trade secrets, some of which were eventually implemented into the THS.  (*Id.* ¶¶ 3, 4.)  Universal, however, disputes that MSEI created any intellectual property.  (Pl.'s SMF ¶ 3.)

MSEI detailed its specifications for the THS and solicited bids to build the first phase of the project.  (Defs.' SMF ¶¶ 8, 10; Pl.'s Supp. SMF ¶ 10.) Interested suppliers, including Universal, signed a Confidential Disclosure Agreement (CDA) and were provided access to MSEI's specifications. (Defs.' SMF ¶¶ 133-34; Dkt. No. 196, Attach. 39.)  The CDA outlined Universal's obligations to keep the specifications confidential under section five of the agreement.  (Dkt. No. 196, Attach. 39 § 5.)  It also included a sunset provision which stated that Universal's "obligations under Section 5(a) stop at the end of the [p]rotection [p]eriod" and that the protection period ended on December 30, 2012.  (*Id.* § 4(a), (d).)

MSEI selected Universal to construct the first THS line (hereinafter "THS1A").  (Defs.' SMF ¶ 12.)  MSEI and Universal memorialized their

contract in an Equipment Purchase Agreement (EPA) in June 2007. (*Id.* ¶ 17; Pl.'s Supp. SMF ¶ 16; Dkt. No. 196, Attach. 7.)

The EPA contained several provisions regarding intellectual property. (Dkt. No. 196, Attach. 7.) The EPA defined the term "Pre-Existing Intellectual Property" to mean "any trade secret . . . or protectable design that ha[d] already been conceived or developed by anyone other than MSEI before [Universal] render[ed] any services." (*Id.* § 8.2(a).) If Universal incorporated Pre-Existing Intellectual Property in the THS1A, it "grant[ed] MSEI, MSEI's subcontractors, or suppliers, a non-exclusive . . . license" to use such property "for MSEI's internal use only." (*Id.* § 8.2(d).) As also relevant, section 8.4 explained that Universal was not providing customized equipment for MSEI. (*Id.* § 8.4.) The section also contained a carve out provision permitting MSEI to keep previously created intellectual property and any property created using MSEI's intellectual property. (*Id.*) Specifically, the section provided that if Universal customized "equipment" for MSEI, MSEI owned the intellectual property created "during the course of th[e EPA]" that would be "customized for MSEI" where Universal "[wa]s given access to MSEI owned intellectual property to complete the customization." (*Id.*)

5

Universal had previously developed automated machines called the Polaris MP and Polaris Jr. robots. (Pl.'s Supp. SMF ¶¶ 3-5.) These robots contain software and source code developed by Universal's employees. (*Id.* ¶ 7, 9.) Universal contends that these robots were part of a standard platform it used in automation lines that it supplied to its customers. (*Id.* ¶¶ 1-2.) MSEI asserts that Universal does not have a standard platform and always customizes software and source code in the Polaris robots to meet a customer's needs. (Defs.' Supp. SMF ¶¶ 2, 9; Dkt. No. 217, Attach. 1; Defs.' SMF ¶ 28.)

While Universal was developing the THS1A, MSEI requested that Universal provide it with source codes upon delivery of the THS1A in order to provide long-term support for the THS system. (Pl.'s Supp. SMF ¶¶ 133-34.) Universal initially refused because it contended that the EPA did not require it to provide MSEI with access to its source codes. (Pl.'s Supp. SMF ¶¶ 132, 135.) However, Universal ultimately provided MSEI with the codes citing threats by MSEI to withhold payment for the project. (*Id.* ¶¶ 136-38.) MSEI contests that it threatened to withhold payment. (Defs.' Supp. SMF ¶ 136.) Rather, MSEI asserts that Universal had an obligation to provide the customized source codes, which it claims it owned

6

according to the terms of the EPA.  (*Id.*; Defs.' SMF ¶¶ 33-36, 48.)

Universal delivered the THS1A line to MSEI with the source codes, which

MSEI signed for in a Final Customer Acceptance letter (hereinafter "FCA

letter").  (Dkt. No. 209, Attach. 27.)

MSEI then requested bids for the THS1B and the THS2, the

subsequent phases of the THS.  (Pl.'s Supp. SMF ¶¶ 49-50.)  Universal bid

on these projects, but MSEI awarded the contracts to MTA, Universal's

competitor.  (*Id.* ¶¶ 49-50, 144.)  Universal maintains that MSEI had

already promised it would award Universal the contracts in exchange for a

discounted quote for a separate project called the separate surface mount

line (hereinafter "SMT").  (3d Am. Compl. ¶ 292.)

In order to complete the THS1B and THS2, MSEI provided MTA with

all of the source code from the THS1A.  (Pl.'s Supp. SMF ¶ 29.)  MTA then

used the THS1A source code to build the THS2 and the source code from

the THS2 to build the THS1B.  (*Id.* ¶ 30; Defs.' Supp. SMF ¶ 32.)  During

the course of this litigation, MSEI requested bids to build the THS3, which

Universal again bid on.  (Pl.'s Supp. SMF ¶ 51.)  MSEI awarded MTA the

contract and MTA used source code from the THS2 to build the THS3.  (*Id.*

¶ 31, 144; Defs.' Supp. ¶ 31.)  The parties dispute whether the software

and source codes that were used in the THS1B, THS2, and THS3 were identical to the software and source code created by Universal for the THS1A. (Pl.'s Supp. SMF ¶¶ 29-31; Defs.' Supp. SMF ¶¶ 29-31.) MSEI asserts that the source code is different because it modified the software in the THS1A before it provided it to MTA. (Defs.' Supp. SMF ¶ 78.) Universal acknowledges that MSEI modified the source code but contends the modification was minor. (Pl.'s Supp. SMF ¶ 103.)

Universal has registered certificates with the United States Copyright Office for its server and station software from the THS1A. (Pl.'s Supp. SMF ¶¶ 68, 77.) Universal did not complete any of this copyrighted software until 2008 or 2009, and the registrations do not identify the works as derivative works. (Defs.' SMF ¶¶ 63-64.) Universal did not register the copyrights until after it filed this lawsuit, which were first registered in September 2014. (*Id.* ¶ 67; 3d Am. Compl., Attachs. 3-10.) MSEI had access to the copyrighted source code and software; however, the parties dispute whether MTA had access to the same copyrighted works. (Pl.'s Supp. SMF ¶ 78; Defs.' Supp. SMF ¶ 78.) Additionally, MSEI disputes the conclusion of Universal's experts Terry Wolfe and Richard Hooper who opine that the copyrighted material from the THS1A was copied or was

"predominately line-by-line identical" in the subsequent lines and server.
(Defs.' Supp. SMF ¶¶ 79-102.) MSEI's expert, Timothy Rickard, opines the
source code was customized for MSEI and is substantially different from
Universal's pre-existing code. (Defs.' SMF ¶ 15; Dkt. No. 208 ¶ 25, Item
Nos. 6, 8, 10, 18, 20, 22.)

## B.    Procedural History

Universal commenced this action on July 15, 2013, alleging breach
of contract, misappropriation of trade secrets, unfair competition, unjust
enrichment, and promissory estoppel. (Compl., Dkt. No. 1.) MSEI
commenced a separate action against Universal on September 13, 2013,
alleging breach of the duty of confidentiality, unfair competition,
misappropriation, and "injunction." (Compl., Dkt. No. 1, 3:13-cv-1144.)
The actions were then consolidated and as noted earlier, the instant action
was designated as the lead action. (Dkt. No. 26.)

Universal amended its complaint three times and included claims of
copyright infringement. (Dkt. Nos. 63, 93, 103.) MSEI and MTA answered
Universal's first amended complaint and counterclaimed for a declaratory
judgment that MSEI and MTA either owned or had a license to the
intellectual property used in the THS1A and sought specific performance of

the EPA. (Dkt. No. 67.) In two currently pending motions, MSEI and MTA move for partial judgment on the pleadings against the first amended complaint and move to dismiss the entire second amended complaint. (Dkt. Nos. 80, 97.) Following Universal's third amended complaint, the parties stipulated that the motions for partial judgment on the pleadings and to dismiss would apply to Universal's third amended complaint. (Dkt. No. 106.) Also pending is MSEI and MTA's motion to strike portions of Universal's third amended complaint. (Dkt. No. 107.)

Before the court resolved the above motions, MSEI and MTA moved for summary judgment. (Dkt. No. 176.) Following an in-court conference, the court denied that motion with leave to renew. (Minute Entry of Oct. 19, 2016.) Now pending is MSEI and MTA's renewed motion for summary judgment on Universal's third amended complaint and its complaint in the member case as well as Universal's cross motion for summary judgment on its complaint and MSEI and MTA's complaint in the member case. (Dkt. Nos. 196, 209.)

### III.  Standards of Review

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for

failure to state a claim." *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 234 (2d Cir. 2012) (internal quotation marks and citation omitted). For a full discussion of the governing standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010), *abrogated on other grounds by J.C. Christensen & Assocs., Inc.*, 786 F.3d 191 (2d Cir. 2015).

Additionally, the standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV. Discussion

The court first addresses MSEI and MTA's motion to strike portions of the third amended complaint. (Dkt. No. 107.) Next, it addresses arguments raised in MSEI and MTA's Rule 12(b)(6) and 12(c) motions that are not mooted by their subsequent motion for summary judgment. (Dkt. Nos. 80, 97.) Finally, the court addresses the parties' summary judgment motions. (Dkt. Nos. 196, 209.)

## A. Motion to Strike

MSEI and MTA argue that the court should strike as redundant certain copyright registrations that are attached to Universal's third amended complaint. (Dkt. No. 107, Attach. 1 at 2-4, 8-10.) In their reply, MSEI and MTA also ask the court to strike certain copyright registrations that purportedly falsely list the year that Universal created its software. (Dkt. No. 119 at 1-2.) In addition, MSEI and MTA seek sanctions and attorney's fees against Universal. (Dkt. No. 107, Attach. 1 at 10-11.) In response, Universal asserts that duplicative registrations do not render a copyright invalid and that MSEI and MTA have not met their burden on this motion. (Dkt. No. 116 at 4-12.)

In limited situations, a party may move the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). To prevail on a motion to strike, the movant must show, among other things, that allowing the challenged allegations to stand would result in prejudice to the moving party. *See Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001). Additionally, the movant must demonstrate that "the allegations have no bearing on the issues in the case." *Id.* (internal quotation marks and citation omitted). Moreover, "it is settled that the motion will be denied,

unless it can be shown that no evidence in support of the allegation would

be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.3d 887, 893

(2d Cir. 1976).  Thus, "courts should not tamper with the pleadings unless

there is a strong reason for doing so." *Id.*

Here, MSEI and MTA have not shown that the duplicative registration

certificates would be inadmissible.  Rather, they assert that "[t]he

[duplicative] registrations cannot be infringed because they are invalid, and

so [they] are not admissible." (Dkt. No. 119 at 3.)  However, as Universal

correctly notes, multiple registrations of the same work do not render a

copyright invalid.  *See Iris Arc v. S.S. Sarna, Inc.*, 621 F. Supp. 916, 920-

21 (E.D.N.Y. 1985).  While Universal ultimately cannot recover on multiple

claims of copyright infringement for the same work, *see Sparaco v. Lawler,*

*Matusky, Skelly Eng'rs LLP*, 313 F. Supp. 2d 247, 250 (S.D.N.Y. 2004) ("A

plaintiff is not entitled to recover twice for the same injury"), this does not

render the duplicative registrations inadmissible.

MSEI and MTA also argue that the court should strike certain

copyright registrations which purportedly contain false software creation

dates.  These registrations are clearly relevant to the issue of copyright

infringement.  Whether the creation dates are false is a matter for trial and

is not a ground to strike a pleading.[3]  *See Roe*, 151 F. Supp. 2d at 510.

Accordingly, MSEI and MTA's motion to strike, (Dkt. No. 107), is denied

and their requests for sanctions and attorney's fees are denied as moot.

**B.    Motion for Judgment on the Pleadings**

MSEI and MTA argue that Universal's unfair competition, unjust

enrichment, and promissory estoppel claims should be dismissed because

they are precluded by either Universal's breach of contract claim, or the

existence of a SMT line agreement.  (Dkt. No. 80, Attach. 2 at 3-6.)

Alternatively, MSEI and MTA contend that Universal's promissory estoppel

claim is barred by the statute of frauds.  (*Id.* at 6-7.)  Universal argues that

MSEI has breached duties independent of the EPA and SMT line

agreement, which do not foreclose its claims against MSEI.  (Dkt. No. 81 at

3-9.)  Additionally, Universal maintains that the statute of frauds does not

bar its promissory estoppel claim because it has suffered an

unconscionable injury.  (*Id.* at 10.)  Finally, Universal contends that it does

not have any contract with MTA and, therefore, its quasi-contract claims

against MTA should not be dismissed.  (*Id.* at 4, 8.)

---

[3]  Additionally, the court rejects this argument because it was made for the first time in
MSEI and MTA's reply papers.  *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993).

14

A plaintiff is precluded from recovering on claims of unjust enrichment, unfair competition, and promissory estoppel if there is an enforceable contract and the allegations rest on obligations which arise from that contract.[4]  *See Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 523 (S.D.N.Y. 2009) (applying New York law to promissory estoppel claim); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 530-31 (S.D.N.Y. 2007) (applying New York law to unjust enrichment claim); *Orange Cty. Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 558 (S.D.N.Y. 2007) (applying New York law to unfair competition claim).  A plaintiff may only recover on these theories if "a duty [is] independent of the contract."  *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011).  That is why "a plaintiff may proceed upon a theory of quasi-contract" in situations "where the contract does not cover the dispute in issue."  *Hochman v. LaRea,* 14 A.D.3d 653, 655 (2d Dep't 2005).  Nevertheless, the statute of frauds may

---

[4]  While the EPA does not contain a choice of law provision and neither party specifically addresses the question of what substantive law the court should apply, both parties implicitly rely on New York law as evidenced by their citation to decisions primarily from the courts of that state and their reference to the decisions of federal courts applying New York law.  (*See, e.g.*, Dkt. No. 199 at iii-iv; Dkt. No. 210 at iii.)  In light of the foregoing, the court applies New York law.  *See Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir. 2000).

bar a quasi-contract claim unless a plaintiff can show that the application of the doctrine would be unconscionable.  *See In re Estate of Hennel*, 133 A.D.3d 1120, 1123 (3d Dep't 2015).

With respect to the unfair competition and unjust enrichment claims, Universal alleges that MSEI improperly disclosed its source code to MTA, which MTA later used in subsequent lines.  (3d Am. Compl. ¶¶ 253-61; 263-75.)  The allegations that form the basis of these two claims do not allege anything independent of Universal's claim for breach of the EPA. (*Id.* ¶¶ 163-81.)  Accordingly, these claims against MSEI must be dismissed.

With respect to promissory estoppel, Universal alleges that MSEI represented that it would select Universal to install and develop the initial THS, the THS2, and the SMT lines in exchange for a combined discounted quote.  (*Id.* ¶ 289.)  The SMT line agreement, which MSEI and MTA attached as an exhibit to their motion, acknowledges the discount but does not mention the THS or THS2 lines.  (Dkt. No. 80, Attach. 1 at 8.)  Thus, this agreement does not cover MSEI's alleged representations, allowing Universal to assert quasi-contract claims.  *See Hochman*, 14 A.D.3d at 654-55.  However, the statute of frauds bars Universal's promissory

estoppel claim and such claim is not saved by the exception of unconscionability. *See* N.Y. U.C.C. § 2-201(1); *see In re Estate of Hennel*, 133 A.D.3d at 1123; *Bernard v. Langan Porsche Audi*, 143 A.D.2d 495, 496 (3d Dep't 1988). Accepting Universal's allegations as true, it lost business when MSEI selected MTA to build the subsequent THS lines and lost monies by providing a discount to MSEI when it contracted to build the SMT line. (3d Am. Compl. ¶¶ 307-10.) These circumstances, however, are not so egregious as to be legally unconscionable. *See In re Hennel*, 133 A.D.3d at 1124-25 (Garry, J.P. dissenting) (collecting cases). Accordingly, the court grants MSEI and MTA's motion on this claim.

Finally, as Universal correctly notes, it does not have a contract with MTA and, therefore, the unjust enrichment and unfair competition claims survive. *See Hochman*, 14 A.D.3d at 654-55. As such, MSEI and MTA's motion for judgment on the pleadings, (Dkt. No. 80), is granted in part and denied in part as set forth above.

## C. **Summary Judgment**

### 1. *MSEI & MTA's Motion for Summary Judgment on Universal's Third Amended Complaint*

MSEI and MTA argue that they are entitled to summary judgment on

all counts of the third amended complaint because, under the EPA, MSEI owns all intellectual property contained in the source codes provided by Universal in the THS1A. (Dkt. No. 199, Attach. 1 at 34-44.) In opposition, Universal contends that MSEI does not own the source codes under the EPA. (Dkt. No. 210, Attach. 1 at 25-42.)

MSEI's ownership claim hinges on the interpretation of section 8.4 of the EPA. In relevant part, section 8.4 reads "that, if during the course of [the EPA], the EQUIPMENT is customized for MSEI [by Universal] . . . any such intellectual property created as a result of such customization . . . will be and remain the property of MSEI." (Dkt. No. 196, Attach. 7 § 8.4.) At the heart of this issue are the source codes provided by Universal to MSEI, which was then given — in some altered form — to MTA. If "equipment" under the terms of the EPA includes the source codes, MSEI can reasonably argue that its disclosure of the source code to MTA was not a breach so long as the source code was "customized for MSEI" and Universal had "access to MSEI intellectual property" to customize the source code. Naturally, if "equipment" excludes software, like the source codes at issue, MSEI is unable to make that argument.

The EPA does not explicitly define "equipment." MSEI and MTA

assert that the contract unambiguously includes software as "equipment," citing other provisions and exhibits to the EPA. (Dkt. No. 199 at 7 n.2, 36; Dkt. No. 220 at 14-16.) Universal, on the other hand, contends that "equipment" unambiguously and exclusively means hardware. (Dkt. No. 210 at 25-28.) They cannot both be correct.

Where contractual language is clear and unambiguous, the court, as a matter of law, enforces the provisions in accordance with their plain and ordinary meaning. *See Selective Ins. Co. of Am. v. Cty. of Rensselaer*, 26 N.Y.3d 649, 655 (2016). Where ambiguity is absent from the contract, extrinsic evidence generally cannot be considered in its interpretation. *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). "To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole." *Brad H. v. City of New York*, 17 N.Y.3d 180, 185 (2011). "Ambiguity is present if language was written so imperfectly that it is susceptible to more than one reasonable interpretation." *Id.* at 186. That interpretation must be reasonable as the court will not "strain[] to find an ambiguity which otherwise might not be thought to exist." *Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 341 (1998). Whether an agreement is ambiguous is a

question of law answered by the court, *see Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009), and the mere fact that the parties interpret language in a contract differently does not necessarily make it ambiguous, *see Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347, 352 (1996).  Finally, "[w]hen the interpretation of an ambiguous contract depends on extrinsic evidence, it presents a question of fact for a jury."  *Arrow Commc'n Labs., Inc. v. Pico Prods., Inc.*, 219 A.D.2d 859, 860 (4th Dep't 1995); *see Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 554 (1982).

Considering the contract as a whole, the term equipment is susceptible to only one meaning, *i.e.*, "equipment" is tangible hardware and does not include software, and, by extension, source codes.  *See* Equipment, *Merriam Webster's Collegiate Dictionary* (10th ed. 1997) (defining equipment as, among other things, "the set of articles or physical resources serving to equip a person or thing as the implements used in an operation or activity"); *see also Rosner v. Metro. Prop. & Liab. Ins. Co.*, 96 N.Y.2d 475, 479-80 (2001) (approving a court's use of dictionaries as a tool to decipher a word's plain meaning).  Most compelling, however, is that in section 8.3, the parties contemplated the scenario in which Universal

"discontinues EQUIPMENT." (Dkt. No. 196, Attach. 7 § 8.3.) Under such a circumstance, MSEI could request, and Universal would grant, a non-exclusive license for "software source codes." (*Id.*) The EPA, read as a whole, suggests that the parties intended to treat software, like the source codes, as separate from and outside of the term equipment. To interpret the contract otherwise would also be unfaithful to the plain meaning of equipment.

That having been said, the court rejects MSEI and MTA's arguments that "equipment" includes software. (Dkt. No. 199 at 7 n.2; Dkt. No. 220 at 14-16.) First, they point to section 1.2 which states that the parties will sell and purchase "all EQUIPMENT as described in Exhibit A and B." (Dkt. No. 196, Attach. 7 § 1.2.) MSEI and MTA direct the court's attention to Exhibit A of the EPA which lists the equipment to be purchased, the payment terms, and the delivery schedule.[5] (*Id.* at 8.) Specifically, they argue that, because Exhibit A lists that MSEI will purchase "all the [non-recurring engineering]" including "(hardware, software and detailed test methodology development)," equipment must also include software. (*Id.* at

---

[5] The exhibits to the EPA have been expressly incorporated into the agreement. (Dkt. No. 196, Attach. 7 § 16.2.)

8; Dkt. No. 199 at 7 n.2.)  However, MSEI and MTA overlook that in Exhibit B under the heading "Functional Requirements Specifications" the contract states that "[s]ource code will not be provided."  (Dkt. No. 196, Attach. 7 at 10-11.)  Thus, section 1.2 and Exhibit A do not support MSEI and MTA's interpretation in light of the conflicting contractual language.

Second, MSEI and MTA refer to the indemnification provision as additional support that equipment includes both hardware and software. (Dkt. No. 199 at 36.)  MSEI and MTA argue that the provision required Universal to indemnify MSEI if the equipment was accused of patent or copyright infringement claims.  (Dkt. No. 196, Attach. 7 § 8.7; Dkt. No. 220 at 14-15.)  MSEI and MTA appear to argue that because patent and copyright infringement claims necessarily pertain to software, the definition of equipment must include software.  (Dkt. No. 220 at 14-15.)  This reading is inconsistent with the EPA.  As Universal notes, the provision only required Universal to indemnify infringement claims against "goods or parts contained in the EQUIPMENT."  (Dkt. No. 196, Attach. 7 § 8.7(a); Dkt. No. 210 at 27.)  The provision does not contemplate that Universal will indemnify software and, consequently, does not support MSEI and MTA's interpretation that equipment includes software.

22

Finally, MSEI and MTA point to section 4.1 which states that the equipment must perform certain specifications including "cycle time, throughput, yield, uptime, [and] machine efficiency." (Dkt. No. 196, Attach. 7 § 4.1(b).) They argue that, because hardware cannot perform these functions without software, equipment must be interpreted to include software. (Dkt. No. 220 at 15.) However, MSEI and MTA's argument requires the court to attach a meaning to equipment based on its component parts rather than interpret the word as a whole. Accordingly, this argument also fails to support MSEI and MTA's interpretation.

Because equipment is interpreted to mean hardware, section 8.4 does not apply to the source codes. (Dkt. No. 196, Attach. 7 § 8.4.) As such, MSEI cannot assert that it owned the source codes as a defense to any of Universal's claims, and MSEI and MTA's motion for summary judgment on this ground must be denied.

2. *MSEI's Motion & Universal's Cross Motion for Summary Judgment on MSEI's Complaint in Member Case*

MSEI argues that it is entitled to summary judgment on all of its claims in the member case because Universal violated the non-disclosure provisions of the CDA by filing a complaint in the lead case which publically

disclosed confidential information.  (Dkt. No. 199 at 49-50.)  Universal

cross moves and contends that it is entitled to summary judgment because

the disclosed information was not subject to the CDA since the agreement

had expired before Universal filed its complaint.  (Dkt. No. 210 at 45-50.)

MSEI filed a complaint alleging a breach of the duty of confidentiality,

unfair competition, misappropriation, and "injunction."  (Compl., 13-cv-

1144.)  An injunction is not a proper claim but merely a remedy.  *See*

*Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 408 (S.D.N.Y. 2010)

("Injunction is not a separate cause of action; it is a remedy.").  MSEI

premises all of its remaining claims on Universal's filings in the lead case.

(Compl. ¶¶ 12-23, 13-cv-1144.)

MSEI argues that Universal breached CDA §§ 2(b) and 5(b) and that

these sections survive the agreement's sunset provision.  (Dkt. No. 199 at

49-50; Dkt No. 220 at 20 n.10.)  Specifically, MSEI contends that the

sunset provision only applies to CDA § 5(a).  (Dkt No. 220 at 20 n.10.)

Universal maintains that the CDA has expired because the sunset

provision applies to the entire agreement.  (Dkt. No. 210 at 46.)  Universal

asserts that section 5(a) is the only provision that lists its contractual

obligations and, thus, the parties clearly contemplated that the sunset

provision would apply to the entire agreement.  (*Id.* at 46-47.)

The CDA contains a choice of law provision which calls for the agreement to be interpreted according to Oregon law.  (Dkt. No. 196, Attach. 39 § 10.)  Oregon law employs the same rules of contract interpretation as New York law, which are discussed above and will not be repeated here.  *Compare Williams v. RJ Reynolds Tobacco Co.*, 271 P.3d 103, 109 (Or. 2011), *with Brad H.*, 17 N.Y.3d at 186.

The sunset provision, in relevant part, provides that Universal's "obligations under Section 5(a) stop [on December 30, 2012]."  (Dkt. No. 196, Attach. 39 § 4(a).)  While this language on its face appears only to apply to section 5(a), when read in the context of the CDA as a whole, MSEI's interpretation would render the agreement nonsensical.  Contrary to MSEI's contention, section 5(a) is the only section which describes Universal's duty to keep information confidential.  Sections 2(b) and 5(b), respectively, explain the purpose for which Universal may use the confidential information and how Universal's employees must treat the confidential information.  (Dkt. No. 196, Attach. 39 §§ 2(b), 5(b).)  These provisions are not themselves separate, independent duties.  MSEI maintains that these sections remain enforceable even though section 5(a)

would expire under the sunset provision. (Dkt. No. 220 at 20 n.10.) However, this interpretation would lead to an absurd result because the underlying duty from section 5(a) — on which sections 2(b) and 5(b) are based — is no longer enforceable. Thus, the only plausible interpretation of the sunset provision is that it applies to the entire CDA and not merely section 5(a). Accordingly, the entire CDA expired on December 30, 2012. (Dkt. No. 196, Attach. 39 § 4(d).)

As noted above, MSEI premises all of its claims on Universal's filings in the lead action. Universal filed its complaint in the lead action on July 15, 2013. (Compl., 13-cv-831.) This is well after the CDA expired. (Dkt. No. 196, Attach. 39 § 4(d).) Therefore, MSEI's motion is denied and its complaint is dismissed and Universal's cross motion on this ground is granted.

### 3. Universal's Motion for Partial Summary Judgment

Universal argues that it is entitled to summary judgment on its claims of copyright infringement, breach of contract, trade secret misappropriation, unfair competition, and unjust enrichment. (Dkt. No. 210 at 10-23, 44-45.) As determined above, the court has already dismissed Universal's unfair competition, unjust enrichment, and promissory estoppel

claims against MSEI.  (*See supra* Part.IV.A.)  The court turns to the remaining claims.

### a.    Copyright Infringement

Universal argues that the court should enter judgment on its copyright claim because it owns valid copyrights to its source code as evidenced by its certificates of registrations, and MSEI and MTA copied this source code when it was included in the subsequent THS lines.  (Dkt. No. 210 at 10-13.)  MSEI and MTA, however, contend that Universal's certificates should not be presumed valid because they were filed more than five years after the source code was published.[6]  (Dkt. No. 199 at 44-45.)  In response, Universal maintains that the source code was never published under the Act's definition and therefore the presumption of validity still applies.  (Dkt. No. 210 at 11-12.)

In order to prove a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v.*

_____

[6]  MSEI and MTA also argue that Universal's copyright claim is time barred.  (Dkt. No. 199 at 45; Dkt. No. 220 at 3-5.)  However, this argument is premised on MSEI's defense that it owned the source codes which the court has now rejected in deciding MSEI and MTA's motion for summary judgment.  *See* Part IV.B.1.

*Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991); *see Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010). A statutory presumption of validity attaches to works registered with the United States Copyright Office. *See* 17 U.S.C. § 410(c); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001). However, certificates of registration filed after five years from the work's first publication are not presumed valid and courts exercise their discretion in what weight to afford the certificates. *See Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 154 n.5 (2d Cir. 2007). To prove copying by a defendant, a plaintiff may rely on "[e]vidence of access and substantial similarity . . . where actual copying cannot be proven." *Zalewski v. T.P. Builders, Inc.*, 875 F. Supp. 2d 135, 141 (N.D.N.Y. 2012).

Universal's copyright infringement theory is as follows: (1) Universal created source code entitled to copyright protection before the MSEI project; (2) Universal used this source code to build the THS1A line; (3) MSEI then gave MTA Universal's source code, which MTA copied in subsequent THS lines that it built for MSEI. (Dkt. No. 210 at 10-13.) It is undisputed, however, that Universal did not file certificates of registration for its source code until sometime after September 2014, (3d Am. Compl.,

Attachs. 3-10), more than five years after it was created, (Defs.' SMF ¶ 63). Ordinarily, a work cannot be presumed valid if there is a five-year registration delay. *See* 17 U.S.C. § 410(c). Nevertheless, Universal argues that the source code should be entitled to the presumption because it was never published under the Act's definition. (Dkt. No. 210 at 11-12.) Universal contends that the source code was subject to express restrictions and has never been made publically available. (*Id.*)

"[C]ertificates of a registration made before or within five years after first *publication* of the work shall constitute prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c) (emphasis added). Under the Copyright Act, a "[p]ublication is the distribution of copies . . . of a work to the public by sale or other transfer of ownership." *Id.* § 101. However, "[t]he showing of a work to a select group of people for a limited purpose . . . does not constitute 'publication' within the meaning of the copyright law, and is legally insufficient to place the work into the public domain." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 288 F. Supp. 2d 544, 555 (S.D.N.Y. 2003). This limited publication is found if the creator showed the publication "(1) to a definitely select group, (2) for a limited purpose, and (3) without the right of diffusion,

reproduction, distribution or sale." *Id.*

Here, Universal satisfies its burden to show that the source code was only subject to limited publication. Under the EPA, Universal licensed the source code to MSEI for its "internal use only." (Dkt. No. 196, Attach. 7 § 8.2(d).) Thus, MSEI did not have the right to further reproduce or sell the source code to another party. Because the publication was limited, it was never "published" under the Act. *See Penguin Books U.S.A., Inc.*, 288 F. Supp. 2d at 555. Therefore, the presumption of validity still applies to Universal's certificates of registrations, which MSEI and MTA have failed to rebut. *See* 17 U.S.C. § 410(c). As such, Universal satisfies the first element of the infringement claim.

With regard to the second element of copying, however, material questions of fact remain. It is undisputed that MSEI had access to Universal's source code. (Pl.'s Supp SMF ¶ 78.) By contrast, the parties dispute whether MTA had access to this same source code because MSEI modified the code before providing it to MTA. (Defs.' Supp SMF ¶ 78.) Additionally, the parties dispute the extent of the similarity between Universal's source code and the source code found on the subsequent THS lines. In support of Universal's position, it cites to its experts, Terry

Wolfe and Richard Hooper, who opine that software found in the THS1A line existed before the MSEI project and is identical or "almost an exact match" to the source code found in the subsequent THS lines.  (Pl.'s Supp. SMF ¶¶ 15, 79-102; Dkt. No. 209, Attach. 83 at 36 § 5; Dkt. No. 209, Attach. 87 ¶ 24.)  In support of MSEI's position, it cites to the declaration of its own expert Timothy Rickard who opines that the source code found in the THS1A line was customized for MSEI and is substantially different from that found in Universal's pre-existing code.  (Defs.' Supp. SMF ¶ 15; Dkt. No. 208 ¶ 25, Item Nos. 6, 8, 10, 18, 20, 22.)  These differing opinions present a battle of the experts, which must be resolved by a jury.  *See Victory v. Hewlett-Packard Co.*, 34 F. Supp. 2d 809, 824 (E.D.N.Y. 1999) ("Resolution of the battle of experts is a matter best suited for the trier of fact.").  Accordingly, Universal's motion for summary judgment on this claim is denied.

>      b.      Breach of Contract

Universal contends that it is entitled to summary judgment because MSEI breached the EPA by giving MTA access to its source code in violation of section 8.2(d), which MTA then used to develop subsequent

THS lines for MSEI.  (Dkt. No. 210 at 19-20.[7])  Universal asserts that the source code is "Pre-Existing Intellectual Property" as defined under section 8.2(a) of the EPA.  (*Id.*)  MSEI first argues that Universal did not perform under the terms of the EPA.  (Dkt. No. 220 at 7-9.)  In addition, MSEI asserts that it did not breach section 8.2(d) of the EPA because Universal did not use "Pre-Existing Intellectual Property" to create the source codes for the THS1A line.  (*Id.* at 6.)  Rather, MSEI argues that Universal completely customized the source codes for MSEI.  (*Id.*; Dkt. No. 199 at 14-16, 38-39.)

Under New York law, "[t]he elements of a cause of action to recover for breach of contract are (1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of contract, and (4) resulting damages."  *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 806 (2d Dep't 2011); *see Stonehill Capital Mgmt., LLC v. Bank of the West*, — N.Y.3d — , 2016 WL 7348990 (N.Y. Dec. 20, 2016).

---

[7]  Universal contends that, despite no express obligation on MSEI, pursuant to the doctrine of *expressio unius est exclusio alterius* MSEI was prohibited from using the source codes outside the scope of the limited license it had.  (Dkt. No. 210 at 19-20.)  MSEI makes no argument in opposition to this point; instead it focused on other reasons demonstrating that it did not breach the EPA.  (Dkt. No. 220 at 14-16.)

Here, it is undisputed that the EPA was a valid contract between the parties. (Defs.' SMF ¶ 12; Pl.'s Supp. SMF ¶ 16; Dkt. No. 196, Attach. 7.) The parties' contentions are directed to Universal's performance and MSEI's alleged breach.

First, Universal asserts that it performed under the terms of the EPA because MSEI accepted the THS1A as evidenced by the FCA letter. (Dkt. No. 210 at 19; Pl.'s Supp. SMF ¶ 18.) MSEI contends that Universal failed to perform because it refused to sell the THS1B for the price specified in the EPA and refused to provide the Polaris Jr. robots to MTA. (Dkt. No. 220 at 7-9.) The court agrees with Universal.

It is fundamental to contract law that "a condition precedent is an act or event, . . . which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (internal quotation marks and citation omitted). "[T]erms such as 'if,' 'unless' and 'until' constitute[] unmistakable language of condition." *Id.* (internal quotation marks and citation omitted). Furthermore, "[e]xpress conditions must be literally performed." *Id.*

Universal and MSEI agreed that Universal would sell the second

phase of the THS, which came to be known as the THS1B, to MSEI for $350,000 "if there is no change in the specification" to the THS project. (Dkt. No. 196, Attach. 7 at 8 ¶ 4.) Here, it is undisputed that changes in the specifications occurred as evidence by change order invoices from Universal to MSEI. (Dkt. No. 209, Attach. 70.) Because the price of the THS1B was conditional and there were changes to the specifications, Universal was excused from providing the THS1B at the price listed in the EPA.

In addition, no provision in the EPA required Universal to provide MTA with its Polaris Jr. robots. Section 8.4 of the EPA, upon which MSEI relies, merely states that Universal's equipment including the Polaris Jr. "is readily available to third parties through [Universal's] current published specifications." (Dkt. No. 196, Attach. 7 § 8.4.) A plain reading of this provision in context with the entire EPA does not mandate that Universal provide its Polaris Jr. robots to MTA. *See Selective Ins. Co.*, 26 N.Y.3d at 655.

Despite the foregoing, a question of material fact remains regarding whether MSEI breached the EPA. Universal maintains that MSEI breached section 8.2 of the EPA by exceeding the scope of the license

34

when it gave MTA the source code. (Dkt. No. 210 at 19-20.) This section provides that if Universal "uses any Pre-Existing Intellectual Property in connection with [the EPA], [Universal] grants MSEI, MSEI's subcontractors, or suppliers, a non-exclusive, royalty-free, worldwide, perpetual license to, use, reproduce, display, of the Pre-Existing Intellectual Property for MSEI's internal use only." (Dkt. No. 196, Attach. 7 § 8.2(d).) In order to determine whether MSEI breached, the court must first assess whether Universal used "Pre-Existing Intellectual Property" in the THS1A line. The agreement defines "Pre-Existing Intellectual Property" to include trade secrets or protectable designs that "ha[ve] already been conceived or developed by anyone other than MSEI before [Universal] render[ed] any services." (*Id.* § 8.2(a).)

The parties advance similar arguments to the copyright infringement claim and dispute whether the THS1A line contains "Pre-Existing Intellectual Property."[8] (Pl.'s Supp. SMF ¶¶ 14-15; Defs.' Supp. SMF ¶¶ 14-15.) The parties cite to the same expert reports and contest whether

---

[8] Universal asserts that MSEI has not properly denied its statement of material fact. (Dkt. No. 224 at 3-4.) However, Universal does not address the opinion of MSEI's expert, upon which MSEI relies, and the court concludes that this expert's opinion creates a genuine issue of material fact.

source code found in the THS1A was pre-existing or customized for MSEI. (Pl.'s Supp. SMF ¶ 15; Dkt. No. 209, Attach. 83 at 36 § 5; Defs.' Supp. SMF ¶ 15; Dkt. No. 208 ¶ 25, Item Nos. 6, 8, 10, 18, 20, 22.)  As with the copyright claim, the conflicting expert opinions must be resolved by a jury. *See Victory*, 34 F. Supp. 2d at 824.  Accordingly, Universal's motion for summary judgment on this claim is also denied.

       c.     Misappropriation of Trade Secrets, Unfair Competition, & Unjust Enrichment

Universal's misappropriation of trade secrets, unfair competition, and unjust enrichment claims rest on its contention that MSEI supplied its source code to MTA, which MTA then used to develop the subsequent THS lines.  (3d Am. Compl. ¶¶ 174-79, 237-40, 255-57, 263, 266.) However, MSEI and MTA dispute that MSEI supplied MTA with Universal's source code.  (Defs.' Supp. SMF ¶¶ 29-32.)  Rather, they claim that MSEI modified the code in the THS1A before it supplied it to MTA.  (*Id.*)

Because Universal's claims for misappropriation of trade secrets, unfair competition, and unjust enrichment turn on the resolution of the same general set of facts as its copyright and breach of contract claims, Universal's motion for summary judgment is denied on these claims as

36

well.

**C.   Surviving Claims**

In sum, the following claims survive and are deemed trial ready.  As against MSEI, Universal's claims for breach of contract, misappropriation of trade secrets, and copyright infringement.  As against MTA, Universal's claims for unfair competition, unjust enrichment, misappropriation of trade secrets, and copyright infringement.

**D.   Filing Under Seal**

The court notes that a protective order is in place, (Dkt. No. 32), and the parties have redacted or filed nearly all of their submissions on these motions under seal, (Dkt. Nos. 196, 209).  In light of this, the court initially files this Memorandum-Decision and Order under seal.  The parties shall advise the court of their joint position regarding sealing within seven days of the date of this Memorandum-Decision and Order.  In particular, the joint submission shall address whether the parties are of the opinion that sealing is required, if so, why, and whether a redacted version of the Memorandum-Decision and Order, and precisely what those redactions would be, can be made available to the public.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that MSEI and MTA's motion to strike (Dkt. No. 107) is **DENIED**; and it is further

**ORDERED** that MSEI and MTA's motion for judgment on the pleadings (Dkt. No. 80) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** with respect to claims of unjust enrichment, unfair competition, and promissory estoppel against MSEI; and

> **DENIED** in all other respects; and it is further

**ORDERED** that MSEI and MTA's motion to dismiss (Dkt. No. 97) is **DENIED AS MOOT**; and it is further

**ORDERED** that MSEI and MTA's motion for summary judgment (Dkt. No. 196) is **DENIED**; and it is further

**ORDERED** that Universal's cross motion for partial summary judgment (Dkt. No. 209) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** with respect to MSEI's complaint in the member case; and it is further

**DENIED** in all other respects; and it is further

**ORDERED** that MSEI's complaint (Dkt. No. 1, 3:13-cv-1144) in the member case is **DISMISSED**; and it is further

**ORDERED** that this case is deemed trial ready and the court, in due course, shall issue a trial scheduling order; and it is further

**ORDERED** that the parties shall advise the court of their joint position regarding sealing within seven (7) days of the date of this Memorandum-Decision and Order. In particular, the joint submission shall address whether the parties are of the opinion that sealing is required, if so, why, and whether a redacted version of the Memorandum-Decision and Order, and precisely what those redactions would be, can be made available to the public; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

February 24, 2017
Albany, New York

Gary L. Sharpe
U.S. District Judge